UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, *et al.*, | : : : | | |
| Plaintiffs, | : : | Civil Action No.: | 20-106 (RC) |
| v. | : : | Re Document Nos.: | 13, 19 |
| ADAM SCHIFF, *in his individual capacity and his official capacity as a Member of Congress for the 28th Congressional District of California*, | : : : : : : | | |
| Defendant. | : | | |

### MEMORANDUM OPINION

GRANTING DEFENDANT'S MOTION TO DISMISS

### I. INTRODUCTION

In this case the Association of American Physicians and Surgeons ("AAPS") and Katarina Verrelli (together "Plaintiffs") allege that Congressman Adam Schiff violated their First Amendment rights and abused his power as a Member of Congress. Plaintiffs claim that Congressman Schiff used his position to coerce technology companies to discriminate against AAPS based on the content of AAPS's speech related to vaccines. This discrimination, they contend, limited Ms. Verrilli's ability—and the ability of those similarly situated—to conveniently access information about vaccines. According to Plaintiffs, Congressman Schiff made public statements that all but forced various technology companies, including Google, Facebook, Amazon, and Twitter, to interfere with and burden their First Amendment rights. Congressman Schiff has moved to dismiss, arguing that Plaintiffs fail to clear several jurisdictional hurdles and, in any event, fail to state a plausible claim to relief. For the reasons

set forth below, the Court finds that Plaintiffs lack Article III standing and that their claims are barred by the Speech or Debate Clause of the U.S. Constitution. Accordingly, the Court grants Congressman Schiff's motion to dismiss.

## II.  BACKGROUND

According to the Amended Complaint, AAPS "is a not-for profit membership organization . . . founded in 1943 to preserve the practice of private medicine, ethical medicine, and the patient-physician relationship." Am. Compl. ¶ 3, ECF No. 17.  AAPS is "a publisher of information related to the medical field" and has members who are "physicians nationwide in nearly all types of practices and specialties" in addition to members who "do not practice medicine." *Id.*  According to Plaintiffs, "AAPS and its physician members are not 'anti-vaccine' but rather favor informed consent based on disclosure of all relevant legal, medical, and economic information." *Id.*  AAPS has published a number of articles on vaccines for well over a decade, including several more recent articles published in early 2019. *See id.* ¶¶ 60–61.  Ms. Verrilli is a resident of New York, *id.* ¶ 4, who "has long been interested in accessing full information about vaccination and using the internet for accessing information about safety and efficacy of vaccination," *id.* ¶ 62.

Plaintiffs take issue with several actions taken by Congressman Schiff.  The Court will summarize those actions in chronological order.  First, on February 14, 2019, Congressman Schiff sent letters to Google and Facebook "to encourage them to use their platforms to prevent what [Congressman] Schiff asserted to be inaccurate information on vaccines." *Id.* ¶ 68.  The letters requested information about what actions the companies currently take to address misinformation about vaccines on their platforms. *See id.*; *see e.g.*, Letter from Hon. Adam B. Schiff to Sundar Pichai, Chief Executive Officer, Google (Feb. 14, 2019),

https://schiff.house.gov/news/press-releases/schiff-sends-letter-to-google-facebook-regarding-anti-vaccine-misinformation.  Second, on March 1, 2019, Congressman Schiff sent a letter to Amazon for what Plaintiffs allege was the same purpose.  *See* Am. Compl. ¶ 69.  The letter requested the same information as the letters sent on February 14.  *See id.*; *see also* Letter from Hon. Adam B. Schiff to Jeffrey Bezos, Chief Executive Officer, Amazon (Mar. 1, 2019) ("Letter to Bezos"), https://schiff.house.gov/news/press-releases/schiff-sends-letter-to-amazon-ceo-regarding-anti-vaccine-misinformation.  Third, on March 7, 2019, Congressman Schiff issued a press release that included the responses to his letters from personnel from Google and Facebook.  *See* Am. Compl. ¶ 71.  Finally, on June 13, 2019, at a hearing of the House Permanent Select Committee on Intelligence, Plaintiffs claim that Congressman Schiff, who chairs the committee, "challenged the immunity that interactive computer services have under Section 230 of the [Communication Decency Act of 1996] and asked panelists if Congress should make changes to that immunity."  *Id.* ¶ 65.  Plaintiffs allege that Congressman Schiff's statements were intended to put the technology companies "on notice that they would need to comply with Congressman Schiff's position or risk his undertaking legislative action against [Section 230]."  *Id.* ¶ 66.  None of Congressman Schiff's public statements specifically mentioned AAPS.

Plaintiffs claim that a number of technology companies took several adverse actions against them because of Congressman Schiff's statements.  The Court summarizes these actions in chronological order as well.  First, on March 1, 2019, "Amazon removed from its platform for streaming videos the popular videos *Vaxxed* and *Shoot 'Em Up: The Truth About Vaccines*."[1]  *Id.*

---

[1] The Amended Complaint does not describe any AAPS ownership or other interest in these titles.

¶ 72.  Second, on Facebook, "pursuant to new restrictions announced March 7, 2019, and released in September of 2019, a search for the URL to an AAPS article on vaccines now produces search results containing two World Health Organization links, a National Institutes of Health link, and a link for the Centers for Disease Control and Prevention."  *Id.* ¶ 76.  Third, "in May of 2019, Twitter . . . now includes a pro-government disclaimer[2] placed above search results for an AAPS article on vaccine mandates."  *Id.* ¶ 74.  Fourth, on August 9, 2019, "Amazon suddenly announced AAPS's termination from the Amazon Associates Program."[3]  *Id.* ¶ 73.  Finally, though they do not specify when this occurred, Plaintiffs claim that "[b]ecause of the dominant market power of Google,[4] Facebook, Amazon, and Twitter, their actions against AAPS's vaccine-related materials resulting from [Congressman] Schiff's coercion has significantly depressed the internet traffic to the AAPS website."  *Id.* ¶ 78.

Plaintiffs allege that Congressman Schiff misused the power of his office to coerce technology companies to discriminate against AAPS.  *Id.* ¶ 88.  They argue that he abused his position "by making an implied threat" against technology companies, which forced them to target AAPS based on the content of its publications.  *Id.* ¶ 92–93.  Congressman Schiff has moved to dismiss the Amended Complaint.  *See* Def.'s Mot. Dismiss, ECF No. 19; Def.'s Mem.

---

[2] The disclaimer states: "Know the Facts.  To make sure you get the best information on vaccination, resources are available from the US Department of Health and Human Services."  *Id.* ¶ 74.

[3] According to Plaintiffs, the Amazon Associates Program "is one of the largest affiliate networks in the world to enable website owners to earn commissions based on their traffic."  *Id.* ¶ 73.  Plaintiffs acknowledge that Amazon purportedly "terminated AAPS . . . [because] AAPS [] stated on the AAPS website that visitors can support AAPS by shopping on Amazon through AAPS's links."  *Id.* ¶ 73.

[4] Beyond this paragraph, Plaintiffs do not allege that Google took any adverse actions against AAPS.

Supp. Mot. Dismiss ("Def.'s Mem."), ECF No. 19-1.[5]  Congressman Schiff argues that Plaintiffs lack standing, that the claims are precluded by the Speech or Debate Clause, that the claims are barred by the doctrine of sovereign immunity, that the claims are not cognizable under the Federal Tort Claims Act, and that the Amended Complaint fails to state a proper claim to relief. *See generally* Def.'s Mem.  Plaintiffs put forth arguments that this Court does have jurisdiction to consider their claims and that the facts alleged plausibly state a claim to relief that should survive a motion to dismiss.  *See generally* Pls.' Mem. Supp. Opp'n Mot. Dismiss ("Pls.' Opp'n"), ECF No. 21-2.  Congressman Schiff's motion is ripe for decision.

### III.  LEGAL STANDARD

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, courts must dismiss any claim over which they lack subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  Rule 12(b)(6), by contrast, requires courts to dismiss any claim upon which relief could not be granted even if jurisdiction was proper.  Fed. R. Civ. P. 12(b)(6).  When these two rules are invoked together, as they are here, a court must first address the issues encompassed by Rule 12(b)(1), as those issues implicate the court's ability to hear the case at all.  *See, e.g.*, *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 64–65 (D.D.C. 2011).

The burden of establishing subject matter jurisdiction "rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted).  In deciding whether the plaintiff has met this burden, courts "'accept as true all of the factual allegations contained in the complaint' and draw all reasonable inferences" in the plaintiff's favor.  *Schmidt*, 826 F. Supp. 2d at 65 (quoting *Brown v. District of Columbia*, 514

---

[5] Congressman Schiff also filed a motion to dismiss the initial complaint filed by Plaintiffs.  *See* Def.'s Mot. Dismiss, ECF No. 13.  Because Plaintiffs subsequently filed an amended complaint, the Court denies Congressman Schiff's initial motion as moot.

F.3d 1279, 1283 (D.C. Cir. 2008)). However, courts need not "accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 44 (D.D.C. 2017) (quoting *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001)). Moreover, the allegations in the complaint "'bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001) (quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350). Indeed, because courts "have an independent obligation to determine whether subject-matter jurisdiction exists," *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006), they are not limited to the arguments raised by the parties when considering a Rule 12(b)(1) motion, and they are free to consider materials outside the pleadings, *see, e.g.*, *Jerome Stevens Pharms. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

## IV.  ANALYSIS

The Court finds that Plaintiffs' claims are jurisdictionally barred for two independent reasons. First, Plaintiffs lack Article III standing. Under Supreme Court and D.C. Circuit precedent, Plaintiffs have not established any of the elements required to demonstrate standing and invoke the Court's jurisdiction under Article III. Second, even if Plaintiffs could establish standing, their claims are barred by the Speech or Debate Clause of the U.S. Constitution, which provides absolute immunity for Members of Congress for claims predicated on legislative activities. The Court addresses each jurisdictional barrier in turn.[6]

---

[6] The Court has determined it does not have jurisdiction because Plaintiffs lack standing and because the claims are barred by the Speech or Debate Clause. As such, it does not address

6

### A.  Standing

To invoke this Court's jurisdiction, Plaintiffs must demonstrate that they have standing under Article III of the U.S. Constitution, which limits the jurisdiction of federal courts to consideration of cases or controversies.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992).  The "irreducible constitutional minimum of standing contains three elements." *Id.* at 560.  To have standing, "(1) [a plaintiff] must have suffered an injury in fact that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'; (2) the injury must be 'fairly traceable to the challenged action of [the defendant]'; and (3) 'it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *N.B. ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 81 (D.C. Cir. 2012) (quoting *Lujan*, 504 U.S. at 560–61).  Where a lawsuit challenges the legality of government action, the standing inquiry depends largely on "whether the plaintiff is himself an object of the action . . . at issue." *Lujan*, 504 U.S. at 561.  When a plaintiff is subject to the challenged action, "there is ordinarily little question that the [government] action . . . has caused him injury, and that judgment preventing . . . the action will redress it." *Id.* at 561–62.  But when a "plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*, much more is needed." *Id.* at 562.  Standing in those cases "is ordinarily 'substantially more difficult' to establish." *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)).

The Court addresses below each of the three essential elements of Article III standing.  For the reasons that follow, the Court concludes that Plaintiffs have failed to establish any of the required elements.  Accordingly, the Court grants Congressman Schiff's motion to dismiss.

---

the other jurisdictional arguments made by Congressman Schiff or assess the plausibility of Plaintiffs' claims under Rule 12(b)(6).

1. Injury

To establish the first element of standing, injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560).

Beginning with Ms. Verrelli, Plaintiffs allege that she "has suffered from limitations on her access on Facebook and Pinterest to information about the safety and efficacy of vaccination," Am. Compl. ¶ 4, and that she no longer can "conveniently access information about vaccination," *id.* ¶ 88. As Congressman Schiff rightly points out, however, Plaintiffs do not allege "that Ms. Verrelli cannot access the materials she seeks nor provide[] any allegations to demonstrate how accessing these materials has been made more difficult for her." Def.'s Mem. at 12. Plaintiffs do not describe how exactly accessing information on vaccination has been made more difficult for Ms. Verrilli. They do not allege that she has lost access to information on vaccinations. Plaintiffs make no attempt in their opposition brief to address this deficiency. *See* Pls.' Opp'n at 2–4 (discussing injury in fact without mentioning Ms. Verrilli). The nebulous allegation that Ms. Verrilli—or any other person similarly situated—can no longer "conveniently access information about vaccination," Am. Compl. ¶ 88, is not "distinct and palpable," *Warth v. Seldin*, 422 U.S. 490, 501 (1975). As such, Plaintiffs have not shown that Ms. Verrelli has suffered an invasion of a legally protected interest that is "'real' and not 'abstract,'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560 n.1)), and, therefore, they have failed to establish that Ms. Verrelli suffered an injury in fact.

Plaintiffs' attempts to establish injury in fact for AAPS fair no better. They offer three potential injuries they claim stem from Congressman Schiff's conduct. First, Plaintiffs argue

8

that Congressman Schiff inflicted a direct injury on AAPS by interfering with the organization's ability to contract and negotiate with technology companies regarding their vaccine content. Pls.' Opp'n at 3–4.  But the Amended Complaint contains no allegations (1) that AAPS has attempted to contract or negotiate with the third-party technology companies, (2) that any specific contracts or negotiations were disrupted by Congressman Schiff's comments, or (3) that AAPS has any concrete plans to contract or negotiate with the third parties in the future.  *See* Am. Compl. ¶¶ 17–18.  As the Supreme Court has explained, "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564.  Perhaps if AAPS attempted to initiate contract negotiations with the technology companies, it would find no impediment whatsoever.  Plaintiffs' allegations about interference with their efforts to contract and negotiate are far too speculative to establish injury in fact.  *See Spokeo*, 136 S. Ct. at 1548 ("[A] plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is . . . 'actual or imminent, not conjectural or hypothetical.'" (quoting *Lujan*, 504 U.S. at 560)).

Second, Plaintiffs allege they have suffered a monetary injury due to decreased internet traffic.  *See* Am. Compl. ¶ 9–11 (alleging that AAPS depends on internet traffic to raise funds and "the visits to the AAPS website declined significantly since March 2019").  Accepting the factual allegation that internet traffic has decreased as true, Plaintiffs still do not plead any facts that suggest AAPS actually suffered any monetary injury.  AAPS has not claimed any actual decrease in membership dues or donation revenues from its website[7] and asks the Court to rely

---

[7] In fact, Plaintiffs claim that user interaction with AAPS's "non-vaccination content held steady." Am. Compl. ¶ 11.  An organization must show a "concrete and demonstrable injury to [it's] activities that is more than simply a setback to the organization's abstract social interests."

9

on "basic economic logic" to infer a monetary injury.[8]  *See* Pls.' Opp'n at 3 (quoting *Shays v. FEC*, 414 F.3d 76, 90 (D.C. Cir. 2005)).  The Court declines to do so and "reject[s] as overly speculative," and therefore conjectural, Plaintiffs' "assumption regarding the future behavior of third parties," hypothetical potential website visitors.[9]  *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015).

Finally, Plaintiffs allege that Congressman Schiff caused a violation of their First Amendment rights to free speech and association.  But Plaintiffs do not allege any concrete limitation on their rights to speak or associate.[10]  Nothing in the Amended Complaint suggests that AAPS can no longer publish information about vaccines.  Although Plaintiffs claim that internet traffic has decreased, they do not allege that the AAPS website cannot be located through an internet search or identify any specific actions taken by Google or any other search

---

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017).  Plaintiffs' failure to allege actual monetary harm is conspicuous, and their filings suggest that their real grievance is with perceived constraints on their dissemination of specific vaccine-related content.  *See, e.g.*, Am. Compl. ¶¶ 11, 16 (alleging reputational injury because some of their "accurate" content has been implicitly, incorrectly labelled as anti-vaccination or misinformation).  "Frustration of an organization's objective[]"—here, advancing an alternative perspective on vaccines—"is the type of abstract concern that does not impart standing." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995).

[8] In the Amended Complaint, Plaintiffs also allege a monetary injury to AAPS in the form of lost *potential* commissions because it was terminated from the Amazon Associates Program in August 2019.  Am. Compl. ¶ 73.  This claim also fails: AAPS has not alleged any actual loss of commissions nor explained loss of potential commissions constitutes a concrete and particularized legal injury.  A mere conclusory allegation of the lost hypothetical chance to make money does not suffice to establish injury in fact.

[9] In *Freedom Watch, Inc. v. Google, Inc.*, the court found the plaintiffs established standing where the complaint alleged that the organization at issue saw "the growth of its audience *and revenues generated* from the [technology companies'] platforms" come to a halt. 368 F. Supp. 3d 30, 36 (D.D.C. 2019) (emphasis added), *aff'd*, 816 Fed. App'x 497 (D.C. Cir. 2020).  This case offers no support to Plaintiffs where they have alleged no concrete reduction in revenues.

[10] Although Plaintiffs allege that Amazon removed two videos from its streaming service, they do not allege any legal interest in either video.

engine that led to the decreased traffic. Moreover, Plaintiffs do not explain how Facebook's addition of links to the World Health Organization, the National Institutes of Health, and the Centers for Disease Control and Prevention to search results burdens their constitutional rights nor do they explain how Twitter's addition of a disclaimer constitutes an "'invasion of a legally protected interest' that is 'concrete and particularized.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560).

Plaintiffs have failed to establish an injury in fact sufficient to support standing. But even assuming, *arguendo*, that any of their alleged injuries were judicially cognizable, Plaintiffs cannot establish the other two constitutional requirements for standing.

2. Causation

To satisfy the Article III causation requirement, a plaintiff must show that the alleged injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (alterations omitted) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). In other words, a plaintiff must establish that it is "substantially probable that the challenged acts of the defendant, not of some absent third party" caused or will cause the injury alleged. *Fla. Audubon Soc'y v. Bentson*, 94 F.3d 658, 663 (D.C. Cir. 1996).

Plaintiffs cannot satisfy the causation element of standing because all the alleged harms stem from the actions of parties not before the Court, not from Congressman Schiff. Plaintiffs' case depends on an analytical leap based on bald speculation rather than allegations of fact. The open letters and public statements made by Congressman Schiff do not mention AAPS,[11] do not

---

[11] Given that Congressman Schiff has never mentioned AAPS or identified the organization as "anti-vaccine," it is not clear why AAPS would worry about his comments

advocate for any specific actions, and do not contain any threatening language. *See, e.g.*, Letter to Bezos. Despite this, Plaintiffs allege that, through the open letters and public comments, Congressman Schiff coerced several companies to take specific actions against AAPS. *See* Am. Compl. ¶ 73 (alleging Amazon terminated AAPS from the Amazon Associates Program); *id.* ¶ 74 (alleging Twitter "now includes a pro-government disclaimer placed above search results for an AAPS article"); *id.* ¶ 76 (alleging that a search on Facebook for an AAPS article now produces search results to various government sources). Also central to Plaintiffs' theory of coercion are Congressman Schiff's comments at a hearing that "challenged the immunity that interactive computer services have under Section 230." *Id.* ¶ 65. Plaintiffs contend that the technology companies understood these comments, which did not mention AAPS or vaccines, "to require acceding to [Congressman Schiff's] wishes on other fronts, such as the actions against his disfavored material on vaccinations on their platforms." *Id.* ¶ 67. These allegations are not plausible and ignore the innumerable other potential causes for the actions taken by the technology companies.[12] The Court agrees with Congressman Schiff that "Plaintiffs point to no facts to support a conclusion that [Congressman Schiff's] letters asking for information could reasonably be the cause of any of their alleged injuries by independent third-party actors." Def.'s Mem. at 15. Article III requires that an alleged injury "fairly can be traced to the

---

specifically directed at "medically inaccurate information about vaccines." *See* Letter to Bezos. According to Plaintiffs, AAPS is not "anti-vaccine." Am. Compl. ¶ 59.

[12] As Congressman Schiff points out, the comments at the hearing, which took place on June 13, 2019, occurred after the technology companies took many of the actions described in the Amended Complaint. Def.'s Mem. at 17. Amazon removed the videos on March 1, 2019, Am. Compl. ¶ 72, Twitter added a disclaimer in May of 2019, *id.* ¶ 74, and Facebook added government links to search results pursuant to a policy announced March 7, 2019, *id.* ¶ 76. As such, on top of the other problems Plaintiffs have showing causation, they fail to establish a chronological chain of causation between the comments at the hearing and these actions taken by the technology companies.

challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon*, 426 U.S. at 41–42. Plaintiffs fail to make this showing and thus fail to establish causation for purposes of standing.

### 3. Redressability

Finally, to establish redressability, a plaintiff must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotation marks omitted). The redressability element requires more than "mere[] speculation as to what third parties will do in response to a favorable ruling." *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1274 (D.C. Cir. 2007).

Plaintiffs fail to establish redressability for the same reasons they fail to show causation. It is pure speculation that any order directed at Congressman Schiff would affect the behavior of the third-party technology companies not before the Court. Because Plaintiffs cannot show that Congressman Schiff's actions caused the technology companies to behave in a particular way, they cannot establish that a remedy directed at his actions would result in the companies changing their behavior. Plaintiffs have not shown that forcing Congressman Schiff to retract his public statements—which, importantly, did not ever mention AAPS or call for any specific action—would likely lead to any action by the technology companies. It is not plausible that Google, Facebook, or Twitter (or any other technology company) would revise their policies on medical misinformation simply because one congressman modifies his previous very generalized public statements about vaccine misinformation. It is even more unlikely that a retraction of public statements that never specifically mentioned AAPS would cause technology companies to modify their treatment of AAPS. *Klamath v. Water Users Ass'n v. FERC*, 534 F.3d 735, 739 (D.C. Cir. 2008) (stating that where relief "depends on actions by a third party before the court,

the [plaintiffs] must demonstrate that a favorable decision would create a 'significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)).  Because Plaintiffs' allegations do not demonstrate a significant increase in the likelihood that the relief sought against Congressman Schiff will reverse the decline in internet traffic to AAPS's site, reestablish its membership in the Amazon Associates Program, cause social media platforms to cease the content moderation policies allegedly infringing on their First Amendment rights, or remove a perceived obstacle to negotiating with the technology companies, the Court finds Plaintiffs have failed to show redressability.[13]

### B. Speech or Debate Clause

The Speech or Debate Clause of the Constitution (the "Clause") states that "for any Speech or Debate in either House, [Members of Congress] shall not be questioned in any other Place."  U.S. Const. art. I, § 6, cl. 1.  The Clause "reflects the Founders' belief in legislative independence."  *Rangel v. Boehner*, 785 F.3d 19, 23 (D.C. Cir. 2015) (citing *United States v. Brewster*, 408 U.S. 501, 524 (1972)).  The Clause "provides absolute immunity from civil suit" and has been consistently read "broadly to achieve its purposes."  *Id.* (internal quotations omitted) (citing *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502–03 (1975)).  To this end,

---

[13] Plaintiffs suggest that the Court should allow them to join the technology companies as defendants "so that they no longer would be independent third parties not before the Court." Pls.' Opp'n at 6.  As Congressman Schiff notes in reply, Plaintiffs have known about his standing arguments since the filing of the first motion to dismiss.  *See* Def.'s Reply at 8, ECF No. 22.  Plaintiffs have known about the conduct of the independent third parties since they filed the initial complaint but chose not to add them as defendants in their Amended Complaint. Moreover, because the claims are independently barred by the Speech or Debate Clause, adding additional defendants would not even arguably cure this independent basis for dismissal. Regardless, leave to file an amended complaint is obtained by motion with the proposed amended complaint attached, D.D.C. Civ. R. 15.1, not by an aside buried in an opposition brief.

the Clause does not only apply to actual "Speech or Debate," but also to all "legislative acts." *Doe v. McMillan*, 412 U.S. 306, 312 (1973).  The Supreme Court has held that "a Member's conduct at legislative committee hearings . . . may not be made the basis for a civil or criminal judgment against a Member because that conduct is within the sphere of legitimate legislative activity." *Gravel v. United States*, 408 U.S. 606, 624 (1972) (quotation marks omitted).  The D.C. Circuit has stated "information gathering, whether by issuance of subpoenas or field work by a Senator or his staff, is essential to informed deliberation over proposed legislation." *McSurely v. McClellan*, 553 F.2d 1277, 1286 (D.C. Cir. 1976) (en banc).  As such, "acquisition of knowledge through informal sources is a necessary concomitant of legislative conduct and thus should be within the ambit of the privilege." *Id.* at 1287 (quoting Reinstein & Silverglate, *Legislative Privilege and the Separation of Powers*, 86 Harv. L. Rev. 1113, 1154 (1973)); *see also Jewish War Veterans of the U.S. of America, Inc. v. Gates*, 506 F. Supp. 2d 30, 57 (D.D.C. 2007) ("[A] Member's gathering of information beyond the formal investigative setting is protected by the Speech or Debate Clause so long as the information is acquired in connection with or in aid of an activity that qualifies as 'legislative' in nature.").  Where a plaintiff's claims are predicated on legislative acts, the Clause "operates as a jurisdictional bar." *Howard v. Off. of Chief Admin. Officer of U.S. House of Reps.*, 720 F.3d 939, 941 (D.C. Cir. 2013).

Congressman Schiff first argues that because the Clause protects a Member's conduct at legislative committee hearings, he is absolutely immune from Plaintiffs' claims stemming from his conduct at the June 13, 2019 committee hearing.  *See* Def.'s Mem. at 21 (citing *Gravel*, 408 U.S. at 624).  Next, Congressman Schiff claims that the information gathering letters sent to technology companies also represent protected legislative activity.  *See id.* at 21–25.  He argues that "[a]ll three letters sought responses to the same specific questions concerning a matter on

which Congressman Schiff actively legislates, votes, and engages in other official responsibilities." *Id.* at 23.  In response, Plaintiffs begin by citing precedent about the limitations on the subpoena power of Congress.  *See* Pls.' Opp'n at 7–9.  Plaintiffs make no effort to claim that Congressman Schiff's statements made during the committee hearing are not protected by the Clause.  They do contend, however, that Congressman Schiff sent the information gathering letters with a "non-legislative purpose," *id.* at 10, and that the Court should recognize his actions as "an attack on viewpoints that he opposed," *id.* at 12, rather than protected legislative activity.  In reply, Congressman Schiff argues that Plaintiffs fail to grapple with binding Supreme Court and D.C. Circuit precedent that says information gathering is protected by the Clause.  *See* Def.'s Reply at 11–12.

      The Court agrees with Congressman Schiff.  First, his statements made during the June 13, 2019 committee hearing undoubtedly fall under the protection of the Clause.  The Supreme Court has held that "a Member's conduct at legislative committee hearings . . . may not be made the basis for a civil or criminal judgment against a Member because that conduct is within the sphere of legitimate legislative activity." *Gravel*, 408 U.S. at 624.  Plaintiffs make no attempt to argue otherwise and the Court finds no special circumstances in this case that suggest it should not apply the clear precedent.

      Second, the Court finds that the information gathering letters constitute protected legislative acts.  Supreme Court and D.C. Circuit precedent make clear that investigating and information gathering enjoy protection under the Clause.  *See Eastland*, 421 U.S. at 504 ("[T]he power to investigate is inherent in the power to make laws."); *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927) ("[A] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change.");

*Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 416 (D.C. Cir. 1995) ("The privilege also permits Congress to conduct investigations and obtain information without interference from the courts."); *McSurely*, 553 F.2d at 1287 ("The acquisition of knowledge through informal sources is a necessary concomitant of legislative conduct and thus should be within the ambit of the privilege so that congressmen are able to discharge their constitutional duties properly." (citation omitted)).[14] Congressman Schiff plainly sent the letters for the purpose of seeking information about a topic of great public concern. *See* Letter to Bezos ("As a Member of Congress who is deeply concerned about declining vaccination rates around the nation, I am requesting additional information on the steps that you currently take to provide medically accurate information on vaccinations to your users . . . ."). Under binding Supreme Court and D.C. Circuit precedent, Congressman Schiff enjoys immunity from suit for this information gathering activity.

Plaintiffs' arguments in opposition are unpersuasive. First, Plaintiffs argue that the Supreme Court's ruling in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020) suggests that Congressman Schiff's actions went beyond the limits of the congressional authority to investigate. Pls.' Opp'n at 7–8, 11–13. But as Congressman Schiff rightly points out, that case "does not refer to the Speech or Debate Clause" or the scope of the immunity conferred by the

---

[14] Courts in other circuits have also found that the Clause applies to information gathering. *See, e.g.*, *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 530 (9th Cir. 1983) ("Obtaining information pertinent to potential legislation or investigation is . . . within the 'legitimate legislative sphere.'" (quotation marks and citations omitted)); *In re McLean*, No. 18-201, 2019 WL 2353453, at *5 (D. Vt. 2019) ("The privilege also protects Congressional information gathering . . . ."); *Citizens Union of New York v. Attorney Gen. of New York*, 269 F. Supp. 3d 124, 151 (S.D.N.Y. 2017) ("The legislative privilege also protects Congressional fact- and information-gathering activities about the subject of potential legislation[.]"); *SEC v. Comm. on Ways and Means*, 161 F. Supp. 3d 199, 236 (S.D.N.Y. 2015) ("[T]he applicability of the Speech or Debate Clause's protections does not hinge on the formality of the investigation.").

Clause. Def.'s Reply at 9. *Mazars*, which considered whether congressional subpoenas seeking the President's personal financial information were enforceable, *see* 140 S. Ct. at 2026–28, has no bearing on whether Congressman Schiff's actions are protected legislative acts under the Clause. *See Judicial Watch, Inc. v. Schiff*, 474 F. Supp. 3d 305, 319 n.7 (D.D.C. 2020) ("[F]or purposes of Speech or Debate Clause immunity . . . the Supreme Court's resolution of [*Mazars*] . . . has no bearing here.").[15] For this reason, much of Plaintiffs' argument misses the mark. *See* Pls.' Opp'n at 11–13 (discussing limitations on subpoena power outlined in *Mazars*).

Plaintiffs also contend that Congressman Schiff does not enjoy the implied power of inquiry when acting on his own and that he exceeded the scope of his ability to investigate by sending letters to the technology companies. Pls.' Opp'n at 9–10. They suggest that his actions do not enjoy protection because they lack the "integral nexus with legislation." *Id.* at 10. Plaintiffs' conclusory statements about the purpose of Congressman Schiff's letters are unconvincing. Moreover, Plaintiffs fail to explain why, in light of the Supreme Court and D.C. Circuit precedent regarding information gathering noted above, Congressman Schiff's letters seeking information are non-legislative. Congressman Schiff, for his part, points to a resolution he proposed in the House of Representatives as the legislative nexus for the letters. *See* Def.'s Mem. at 24 ("[O]n March 5, 2019, Congressman Schiff introduced House Resolution 179, *Recognizing the Importance of Vaccinations and Immunizations in the United States*."). Plaintiffs make no response to Congressman Schiff's argument. Instead, they make the bare claim that Congressman Schiff's letters have no connection to the legitimate legislative sphere.

---

[15] For the same reason, the other cases Plaintiffs cite about the limits of congressional subpoena powers have no relevance. *See* Pls.' Opp'n at 7–8. Plaintiffs do not allege that a congressional subpoena was issued. They fail to explain why cases dealing with the limits of Congress's subpoena power should have any bearing on the immunity conferred by the Clause.

18

The Court disagrees and finds that Congressman Schiff's actions constitute legislative acts protected by the Clause.  *See McSurely*, 553 F.2d at 1287 ("The acquisition of knowledge through informal sources is a necessary concomitant of legislative conduct and thus should be within the ambit of the privilege so that congressmen are able to discharge their constitutional duties properly." (citation omitted)).

## V.  CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss (ECF No. 19) is **GRANTED**.  Defendant's initial motion to dismiss (ECF No. 13) is **DENIED AS MOOT**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  February 2, 2021                                              RUDOLPH CONTRERAS
                                                                                              United States District Judge